ROBERTA R. JAMES
Attorney Advisor
Environment and Natural Resources
 Division
Law & Policy Section
United States Department of Justice
P.O. Box 7415 – Ben Franklin Station
Washington, DC  20044-7415

JOHN D. HOGGAN, JR.
Assistant United States Attorney
United States Attorney's Office
Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, New York 12207

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN THE MATTER OF THE ADMINISTRATIVE ACCESS TO:<br><br>FORMER CP RAIL MAINTENANCE YARD SUPERFUND SITE<br>  Located near:<br>  215 Broadway<br>  Whitehall, New York | *EX PARTE* APPLICATION FOR ADMINISTRATIVE WARRANT Under Section 104(e) of CERCLA<br><br>No. |

**MEMORANDUM IN SUPPORT OF**
**UNITED STATES' *EX PARTE* APPLICATION FOR AN**
**ADMINISTRATIVE WARRANT UNDER CERCLA SECTION 104(e)**

The United States of America, on behalf of the United States Environmental

Protection Agency ("EPA"), applies *ex parte* for an administrative warrant under

Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9604(e) to enter property known as the Former CP Rail Maintenance Yard Superfund Site ("Site") so that EPA can assess the Site for the release or threatened release of hazardous substances and remove the hazardous substances already identified at the Site by EPA.

As detailed in Exhibit A hereto, the Declaration of Shawna K. Hoppe ("Hoppe Decl.") ¶¶ 21 - 30, and in Section I.D below, despite undertaking reasonable and diligent efforts to obtain access to the Property by consent of the owner, EPA has been unable to obtain consent for access to the Property.

Specifically, the United States seeks this warrant so that EPA and its designated representatives may enter the property located at 215 Broadway, Whitehall, Washington County ("County"), New York, and identified as Section 60.9, Block 2, Lot 8.6 ("Property") for a short term (9 months) to perform removal activities and to determine the need for a response action, choose a response action, implement the response action and/or otherwise enforce the provisions of CERCLA related to the release or threatened release of hazardous substances at the Site.  EPA has concluded that EPA staff, including the On-Scene Coordinator ("OSC"), and other contractors will need access to the Property promptly to begin removal activities and conduct an assessment of the Property to timely develop and implement a Site remedy pursuant to Section 121 of CERCLA, 42 U.S.C. § 9621,

2

and to protect human health and the environment from the dangers of hazardous substances that have been and may be released at the Site.

The United States respectfully requests that the Court issue a warrant to the United States, on behalf of EPA, because: (1) EPA is authorized under Section 104 of CERCLA, 42 U.S.C. § 9604, to obtain entry to the Site for the purpose of carrying out a response action under CERCLA but has not been able to obtain consent to access the Property; (2) the Court is authorized under CERCLA to issue the requested warrant; and (3) such a warrant is justified because if EPA is not permitted to access the Property, it will be unable to proceed with the assessment and cleanup of the Site and thus contamination at the Site will continue to pose a threat to human health and the environment.

Accordingly, by the accompanying Application and this supporting Memorandum, the United States seeks to enforce its authority under CERCLA for entry and access to the Property so that EPA can proceed with Site remediation.

## I.    **FACTUAL BACKGROUND**

A.    Site Background

The Property is currently owned by LFP of Whitehall, LLC, a New York limited liability company ("Whitehall"). In 2018, when EPA first became involved with the Site, as more fully described in Section I.B. below, Whitehall was owned

by Lila Foshay ("Foshay"). Hoppe Decl. ¶ 9. Whitehall is currently owned by the

Fitzpatrick Family Irrevocable Trust. *Id.*

The Site is a former railroad locomotive repair facility, with a portion of the

Property previously used for commercial purposes. Hoppe Decl. ¶ 10. The

Property includes three buildings and a rail spur that comes in from the south. The

Property is bordered to the north and west by US Route 4 (Broadway) (this area

consists of mixed use residential/light commercial structures and residential

housing), to the east by a Canadian Pacific Railway rail line and to the south by

vacant, wooded land. *Id.* There are approximately 900 people residing within ½

mile of the Site and the Whitehall Junior-Senior High School and the Whitehall

Elementary School are located approximately two miles from the Site. *Id.*

The three Site buildings are brick construction and are clustered adjacent to

each other with the closest building approximately 135 feet from Broadway (Rt. 4).

*Id.* Of the three buildings on the Site, Building 1 was reportedly used as an office,

Building 2 was reportedly a former supply building for a locomotive repair shop

and the largest building, Building 3, was the former locomotive repair shop. *Id.*

The buildings are within 700 feet of the Champlain Canal, which is an

intrastate commercial and recreational waterway. *Id.* The Site is not fenced at any

Property boundary and parts of the Site are densely overgrown with vegetation. *Id.*

B.    Initial Inspections and the Removal Site Evaluation

On April 30, 2018, the Village of Whitehall, NY contacted EPA to evaluate the Site for a response action under CERCLA.  Hoppe Decl. ¶ 11.  On May 30, 2018, an authorized representative of Whitehall signed a "Consent for Access to Property" form that allowed EPA to sample material from the insulation on piping and on the floor of the buildings on the Property. Hoppe Decl. ¶ 12. Thereafter, during 2018 EPA performed sampling and Whitehall secured the premises.  *Id.*  At that time, Whitehall also submitted financial information to EPA indicating that it did not have the financial resources to undertake the asbestos removal. *Id.*

On June 1, 2021, EPA conducted a limited survey of the Property, which revealed that portions of two Site buildings were partially collapsed. Hoppe Decl. ¶ 13. Pipe insulation around ceiling pipes was visible in debris on the floor of the buildings and appeared to contain asbestos. *Id.* The Property was largely vacant, except for a portion that was reportedly being used by a different company for the storage of refrigerated box trailers. *Id.* As a result, a Removal Site Evaluation ("RSE"), was determined to be warranted. *Id.* An RSE "includes a removal preliminary assessment and, if warranted, a removal site inspection." 40 C.F.R. § 300.410(a). The RSE was conducted from June to August 2021.  Hoppe Decl. ¶ 15.

5

On June 21, 2021, EPA and its Superfund Technical Assistance and Response Team and Emergency and Rapid Response Services contractors conducted a follow-up inspection of the Site, among other response actions, to determine sampling locations and to identify potential safety concerns. Hoppe Decl. ¶ 14. During that inspection, EPA found that the three Site buildings had fallen into significant disrepair, including missing roof areas, unsecured doors, and collapsed walls. *Id.* The condition of the buildings has led to structural instability and allows for access to the buildings. *Id.* EPA also observed a subterranean area through an opening in the floor in the collapsed portion of Building 2, the contents of which are unknown. *Id.*

Moreover, during this inspection EPA discovered several other disturbing features on the Property.  Specifically, EPA found (1) a shipping container containing several 55-gallon and 5-gallon containers of lubricants, an acetylene gas cylinder, an oxygen cylinder, and a large partially-filled horizontal tank that are located approximately 30 feet south of Building 3 on the Property, (2) a former salt pit approximately five feet deep that is filled with water, (3) an asphalt pad east of the rail spur that is being used to stage refrigerated box trailers, (4) rail tank cars placarded "Flammable" and marked "Liquified Petroleum Gas" have been observed on the rail spur, (5) an irregularly shaped, largely vegetated, mound consisting primarily of soil, railroad ballast and some debris of unknown origin

6

(approximately 30 feet wide and six feet high) that begins approximately 65 feet south of the asphalt pad and continues south into the adjoining property, and (6) an approximately 90-foot by 90-foot catch basin lined with degraded plastic sheeting that is located immediately north of the asphalt pad. Hoppe Decl. ¶ 14.

During the RSE inspections, a total of 12 bulk and four debris samples of suspected asbestos containing material ("ACM") were collected from inside the three buildings. Hoppe Decl. ¶ 15. The materials that were sampled included pipe insulation and floor debris suspected to contain pipe insulation. *Id.* Results indicated all 12 pipe insulation samples contained friable asbestos with concentrations ranging from 8.30% to 23.00% amosite, and 2.80% to 50.00% chrysotile that exceeded EPA's National Emission Standards for Hazardous Air Pollutants for ACM, which defines ACM as materials containing more than 1% asbestos. *Id.* Three of the four debris samples contained up to 17.5% chrysotile and 11.25% amosite, exceeding the 1% asbestos threshold. *Id.* Pipe insulation on the ground north of Building 2 was also sampled and contained Chrysotile asbestos at 31%. Hoppe Decl. ¶ 16. In total, there are approximately 3,680 feet of pipe in the three Site buildings, with 443 feet of pipe covered with asbestos-contaminated pipe insulation. Hoppe Decl. ¶ 16.

EPA contractors also collected a total of eight samples of roofing material from the three Site buildings to be tested for both asbestos and polychlorinated

biphenyls ("PCBs") analysis. *Id.* Additionally, one transite panel from each building was collected and sampled for asbestos. While some of the samples were either non-detect or less than 1% asbestos, friable chrysotile asbestos at 25% was documented in the transite panel sample collected from Building 3. *Id*. Additionally, two samples of ash were collected and analyzed by EPA from a cleanout area at the base of a smokestack adjacent to Building 2. Lead was detected in one of the two samples at an estimated concentration of 880 ppm, which exceeded the EPA Removal Management Level of 800 ppm. Hoppe Decl. ¶ 17.

On February 9, 2022, EPA issued the RSE report, which documented the Site conditions and determined they posed an imminent and substantial endangerment to the public health and welfare and the environment due to the actual or threatened release of hazardous substances. Hoppe Decl. ¶ 18.

C.    EPA's Need to Access the Property to Select and then Proceed with the Removal Action

Exposure to asbestos can cause a variety of adverse human health effects. Breathing in asbestos can cause changes in the pleural membrane of a person's lungs through the introduction of blebs (small blisters) or plaques. Pleural plaques can occur in those working with asbestos products and in people living near areas with elevated levels of asbestos in the environment. Effects on breathing due to the

8

presence of pleural plaques alone are not usually serious. However, prolonged exposure can lead to thickening of the pleural membrane, which may restrict breathing.

The mechanisms for release to the environment include the deterioration of the asbestos inside the buildings, which has led to its spread to interior floors and potentially to ambient air, which could then cause the asbestos to exit the buildings through the many breaches when disturbed by natural wind events or man-made disruption. EPA has determined that all the buildings at the Site are a safety hazard, and in danger of collapse, which heightens the threat of a more significant release.

As part of its assessment of the Property, EPA will conduct sampling and analysis to determine the appropriate disposal of all material to be removed from the Site. Moreover, EPA selected a Removal Action at the Site and approved the expenditure of $1,929,600 to address the known threats posed by the Site in an Action Memorandum dated August 16, 2022 (the "Action Memorandum"). Hoppe Decl. ¶ 19. EPA requires access to the Property to complete, at a minimum, the below actions necessary to implement the Removal Action. *Id.*

The Removal Action includes, but is not limited to:

> 1) securing the services of a structural engineer to evaluate the structural integrity of buildings 2 and 3 and make recommendations for how the buildings should be addressed during the removal action;

2) implementing the recommendations of the structural engineer;

3) removing and containerizing the friable ACM from buildings 1, 2, and 3;

4) removing and containerizing the contaminated building debris generated during the removal action;

5) removing and containerizing the top two inches of soil in areas suspected to be contaminated with asbestos fibers;

6) removing and containerizing the contaminated ash from the Building 2 smokestack and surrounding soil;

7) collecting, securing and disposing of all drums and containers of waste encountered or uncovered during the removal action;

8) disposing of the contents of a horizontal tank and subsequently decommissioning the tank to prevent further accumulation of liquid;

9) investigating the known subterranean area in Building 2, identifying any other similar structures once the building debris is cleared, and mitigating any actual or threatened releases of hazardous substances, pollutants, or contaminants in such areas; and

10) disposing of all hazardous substances and containerized debris at an EPA-approved disposal facility in accordance with the Off-Site Rule, 40 CFR § 300.440. EPA estimates that the duration of the required entry and access to conduct the removal action will be approximately ten months, contingent upon available funding, disposal requirements, and weather conditions.

*Id.*

D.    <u>EPA Unsuccessfully Sought Permission to Access the Property</u>

On March 25, 2022, Foshay, after marrying and changing her last name to

Rinaldi, sold, assigned, and transferred all her ownership interest in Whitehall to

Aden Brook Holdings, LLC ("Aden"). Hoppe Decl. ¶ 20. Aden, through Nektarios

Fitzpatrick ("Fitzpatrick") as the representative of Aden, assigned and transferred

its ownership in Whitehall to the Fitzpatrick Family Irrevocable Trust ("Trust"),

and the Trust simultaneously assigned Fitzpatrick as the Manager of Whitehall and

gave him the power, among other things, to enter into any agreement on behalf of

Whitehall. *Id.*

On June 21, 2023, EPA sent a letter to Whitehall, in the care of Fitzpatrick

and attorneys for Whitehall, containing a notice of potential liability under

CERCLA Section 107(a), 42 U.S.C. § 9607(a), a Request for Information pursuant

to Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), and a request to enter into a

settlement agreement which would allow Whitehall to conduct the necessary

response action at the Site under EPA oversight. Hoppe Decl. ¶ 21. Despite

receiving an extension, Whitehall never submitted a response to the Request for

Information. *Id.*

In August 2023, EPA attempted to work with Whitehall's attorneys to

arrange for a Site visit with the EPA OSC, Margaret Chong, and Fitzpatrick on

behalf of Whitehall for the purpose of discussing Whitehall's implementation of the

response action called for in the Action Memorandum. Whitehall failed or refused

to agree to the Site visit. Hoppe Decl. ¶ 22.

From June to September 2023, EPA engaged in negotiations with Whitehall

about its consensual performance of the response action. At this time, Whitehall

was represented by the law firm Couch, White, and Fitzpatrick LLP ("Couch

White"). Whitehall missed several deadlines during settlement negotiations,

including, but not limited to, the date to reach a settlement in principle with EPA

and the due date for its response to the Section 104(e) of CERCLA Request for

Information. In addition, Whitehall cancelled meetings with EPA after the inability

of the attorneys to consult with their client and refused to agree to a Site visit by

the OSC, Margaret Chong. Ultimately, EPA notified Whitehall that EPA could not

foresee how Whitehall could properly and promptly conduct the response action in

a manner that was satisfactory to EPA.  Hoppe Decl. ¶ 23.

On October 5, 2023, the EPA OSC contacted Fitzpatrick to notify him that

EPA was proceeding with implementing the response action called for in the

Action Memorandum and EPA planned to visit the Site that month. Hoppe Decl.

¶ 24. Fitzpatrick told the OSC that he was "no longer involved with the Site," had

"nothing to do with it," and said that EPA should speak to the attorneys, who were

still representing Whitehall. *Id.*

Based on Fitzpatrick's comments, on October 11, 2023, EPA's Assistant

Regional Counsel, Elizabeth Leilani Davis, called Couch White regarding the

upcoming Site visit. Hoppe Decl. ¶ 25.  On October 12, 2023, Ms. Davis followed

up her call with an electronic mail message that stated the OSC planned to visit the

Site the week of October 23, 2023. *Id.* The electronic mail message also stated that,

given Fitzpatrick's October 5th comments that he was no longer involved with the Site, EPA was contacting Whitehall's attorneys to determine who to contact to coordinate the Site visit. *Id.* Ms. Davis did not receive a response to this electronic message. *Id.*

Again, on October 13 and 17, 2023, Ms. Davis called Couch White regarding access to the Site and the upcoming site visit.  Hoppe Decl. ¶ 26. In response, EPA received an email from Couch White, stating that the firm had previously informed EPA that Whitehall no longer consented to EPA's access to the Site, the firm was not provided with authority to change Whitehall's position, and therefore, EPA did not have Whitehall's permission to enter the Property. *Id.*

In a letter dated December 14, 2023, and addressed to Whitehall, EPA sent its final request for consent to EPA's access to the Property to conduct the response action described in the Action Memorandum. Hoppe Decl. ¶ 27. Whitehall was given until January 3, 2024, to return a signed Consent for Access to Property form to EPA. EPA did not receive a response to its letter. *Id.*

To ensure that the December 14th letter was received by Whitehall, on January 23, 2024, EPA sent via overnight or certified mail copies of that letter to Whitehall's representative at his post office box and residence, as well as to Couch White. *Id.* In that transmission, Whitehall was given until January 31, 2024, to respond to EPA's request for access in the December 14th letter. EPA received

confirmation that the letter was delivered and received by all parties. As of the issuance of this Order, Whitehall has never responded to EPA's December 14th letter. *Id.*

On February 29, 2024, EPA issued Administrative Order Directing Compliance with Request for Access ("Order"), pursuant to Section 104(e)(5)(a) of CERCLA, 42 U.S.C. § 9604(e)(5)(a), to Whitehall. Hoppe Decl. ¶ 28. The Order required Whitehall to provide EPA and its representatives with unrestricted access at all reasonable times to the Property for the purpose of conducting the response activities set forth in the Order. *Id.* The Order was mailed and emailed to Whitehall, Fitzpatrick, and Couch White the same day. *Id.* EPA never received the signed access form from Whitehall before the Order became effective on March 21, 2024. *Id.*

On May 14, 21, 22, 28, and 29th 2024, on EPA's behalf, Catherine Adams Fiske, a senior attorney in the Environmental Enforcement Section of the Department of Justice, attempted to contact Couch White to gain access to the Property and Site. Hoppe Decl. ¶ 29. Ms. Fiske's attempts were unsuccessful, culminating in a statement from Fitzpatrick's counsel, that while he represents Whitehall, he has "no point of contact at the company at this time." *Id.* Again, consent for access to the Property was not granted by Whitehall. *Id.*

14

On July 22, 2024, the current OSC for the Site, Mark Gallo, contacted

Fitzpatrick in a final attempt to obtain Whitehall's consent for access without

seeking a warrant.  Hoppe Decl. ¶ 30.  During that conversation, Fitzpatrick

informed the OSC that he no longer represents Whitehall, and advised the OSC to

contact his counsel. *Id.* As of the date of this declaration, neither Whitehall nor any

representative of Whitehall has granted consent for EPA to access the Property to

conduct the necessary response actions.  *Id.*

## II.    DISCUSSION

A.    Legal Standard

Congress enacted CERCLA, 42 U.S.C. §§ 9601-9675, in response to

widespread concern over the severe environmental and public health effects arising

from the improper disposal of hazardous wastes and other hazardous substances.

*See Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994); *Dedham Water

Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1078, 1081 (1st Cir. 1986);

*Eagle Picher Indus. v. EPA*, 759 F.2d 922, 925-26 (D.C. Cir. 1985).  EPA has

broad authority to investigate and clean up hazardous waste sites and to enter such

sites for those same purposes. *See* Sections 104(a), (b) and (e) of CERCLA, 42

U.S.C. §§ 9604(a), (b) and (e).  Section 104(e)(1) authorizes the President, or any

duly delegated representative, to exercise the access authority of Section 104(e) for

the broad purposes "of determining the need for response, or choosing or taking

15

any response action under [CERCLA], or otherwise enforcing the provisions of [CERCLA]."[1]  42 U.S.C. § 9604(e)(1).

CERCLA defines "response" to mean "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25).  A "removal" action is "the cleanup or removal of released hazardous substances from the environment," and may include "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances."  42 U.S.C. § 9601(23).

Under Section 104 of CERCLA, EPA and its representatives are authorized to enter property to conduct response activities when EPA determines that "there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant."  42 U.S.C. § 9604(e)(1).[2] Section 104(e)(3) authorizes EPA and its representatives to enter any vessel, facility,[3] or establishment associated with a release or threat of release of hazardous

---

[1]  The President has delegated his authority under Section 104 of CERCLA to EPA. Exec. Order No. 12580, 52 Fed. Reg. 2923, 2925 (Jan. 29, 1987).

[2]  Section 101(22), 42 U.S.C. § 9601(22), defines "release" to mean "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)."

[3]  Section 101(9), 42 U.S.C. § 9601(9), defines "facility" as:

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor

substances, including "property where entry is needed to determine . . . the appropriate response *or to effectuate a response action* under [CERCLA]." 42 U.S.C. § 9604(e)(3) (emphasis added). Section 104(e)(6) authorizes EPA, via its delegation from the President (*see supra* fn. 1) to secure such access in any lawful manner. 42 U.S.C. § 9604(e)(6).

Courts interpret Section 104(e) of CERCLA to provide for the warrant authority that is sought in the instant application. *See In re Yoder's Slaughterhouse Site,* 519 F. Supp. 2d 574, 578-79 (D. Md. 2007) (citing *Boliden Metech, Inc. v. United States*, 695 F. Supp. 77, 80 (D.R.I. 1988)); *see also Koppers Indus. v. EPA*, 902 F.2d 756, 758-59 (9th Cir. 1990) (denying as moot appeal from district court's denial of motion to quash warrant issued under CERCLA Section 104(e)). The present circumstances are similar to those in *In re Yoder's Slaughterhouse*, where EPA had applied for an *ex parte* administrative warrant after it was unsuccessful in its attempts to identify the owners of the targeted property. 519 F. Supp. 2d at 576-77. The court found that the issuance of an administrative warrant was appropriate "immediately upon the EPA demonstrating that it has located the person or entity with such authority and they will *not*

---

vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

consent." *Id.* at 579–80 (emphasis in original). And "where Congress has given power to an agency to enter and make inspections, the agency *ipso facto* is empowered to seek a warrant." *Id.* at 579 (citing *Boliden Metech, Inc. v. United States*, 695 F. Supp. 77, 82 (D.R.I. 1988)).

Not only is a warrant appropriate, but courts have determined that EPA may obtain them on an *ex parte* basis. In the case of *In re Bunker Hill Co. Lead & Zinc Smelter v. U.S. EPA*, 658 F.2d 1280, 1285 (9th Cir. 1981), the Ninth Circuit rejected Bunker Hill's objection to the issuance of an *ex parte* inspection warrant and affirmed that federal agencies have the ability to obtain *ex parte* warrants to conduct inspections, citing *Stoddard Lumber Co. v. Marshall*, 627 F.2d 984 (9th Cir. 1980) (concerning OSHA inspection warrants issued to the Department of Labor). It is especially appropriate that EPA seek access through an *ex parte* warrant where, as here, EPA has tried diligently to obtain access from Whitehall, the owner of the property, but has been unable to do so. *See supra* Section I.D.

B.    EPA Has Shown a Reasonable Basis for Issuance of the Warrant

Under CERCLA Section 104(e), the standard for determining whether a court may issue an administrative warrant for access is whether "there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant." *United States v. Fisher*, 864 F.2d 434, 437 (7th Cir. 1988) (quoting 42 U.S.C. § 9604(e)(1)). The standard for

cause justifying the issuance of an administrative warrant is less rigorous than a search and seizure warrant in a criminal investigation and requires only a showing of either "specific evidence of an existing violation" or "'reasonable legislative or administrative standards'" for conducting a particular inspection. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320 (1978) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 538 (1967)).[4]  Where "a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant." *Camara*, 387 U.S. at 539 (citing *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186 (1946)).  For administrative warrants, including those issued under CERCLA, "reasonableness is . . . the ultimate standard." *Id.*

A reasonable basis is present here to believe that a release of hazardous substances, or the threat of such a release, exists at the Site.  Hoppe Decl. ¶¶ 12 – 19, 32 – 35.  As detailed above (*supra* Section I.B), EPA undertook investigation of the dangers posed by contamination at the Site and EPA determined that response actions were necessary under CERCLA to address the release and threat of release of hazardous substances at the Site.  After completing the RCE, EPA

---

[4]    This relaxed standard rests on the premise that the interests of protecting public health and safety under an established legislative scheme may justify government intrusion upon the privacy rights of a public establishment. *E.g.*, *Martin v. Int'l Matex Tank Terminals-Bayonne*, 928 F.2d 614, 620–22 (3d Cir. 1991) (explaining the standard for administrative warrants under the Occupational Health and Safety Act).

determined that further assessment and a Removal Action were necessary to protect

public health or the environment from actual or threatened releases of hazardous

substances from the site into the environment. Hoppe Decl. ¶¶ 18 and 19.

Moreover, EPA has a reasonable basis for seeking the specific access sought

in the accompanying Application. As described above (*supra* Section I.C), the first

phase of the remedial action involves stabilizing the building on the Site,

performing more sampling and analysis, identifying additional materials for

removal and proper disposal, and removing and disposing the ACM already

identified by EPA during the June 21, 2021, RCE. Hoppe Decl. ¶ 19 and 37. To

meet this schedule, EPA personnel, as well as EPA's agents, contractors, and other

representatives, need access to the Property promptly and for a period of at least 9

months to perform the necessary work. *Id*. at ¶ 38. This access request is

minimally intrusive given that the Property is currently vacant, unused, and

unoccupied. *Id.* at ¶ 37. Thus, granting access will not interfere with any ongoing

activity on the Property, and the public interest to be served by EPA's requested

entry onto the Property justifies the issuance of an administrative warrant.

C.    The Court Should Issue the Warrant *Ex Parte*

This Court has the authority to issue the warrant ex parte under CERCLA

where, as here, the "owner will not consent to the EPA's proposed activities," and

the EPA has a reasonable basis to believe there may be a release or threat of

release of a hazardous substance at the property.  *In re Yoder's Slaughterhouse*, 519 F. Supp. 2d at 579; *see also Bunker Hill*, 658 F.2d at 1285; *Nat'l-Standard Co. v. Adamkus,* 685 F. Supp. 1040, 1048-49 (N.D. Ill. 1988) (ex parte warrant issued to EPA to perform inspections under analogous federal environmental statute) *aff'd*, 881 F.2d 352 (7th Cir. 1989); *In re Search Warrant*, No. MISC.NO.04–00079–MPT, 2004 WL 1368848, at *4 (D. Del. June 10, 2004) (concluding that ex parte application for warrant under Clean Water Act was proper and not indicative of bad faith by EPA).

Here, EPA has produced sufficient evidence to justify issuance of the administrative warrant *ex parte* pursuant to CERCLA.  Like the warrant obtained in *Nat'l-Standard*, attached hereto is sworn testimony of an EPA supervisor attesting to the releases and threatened releases from the Site.  *See Nat'l-Standard,* 685 F. Supp. at 1047 (citing as support for the *ex parte* warrant the "sworn statements of an EPA officer . . . stating that she believed, from personal knowledge, that releases of hazardous wastes had occurred").  In this instance, EPA's sworn testimony includes the extensive efforts EPA has pursued to communicate with the owner of the Property and has been unable to obtain consensual access.  Hoppe Decl. ¶¶ 21 – 28.

In addition, administrative agencies "may obtain . . . warrants *ex parte* even when surprise is not necessary."  *Bunker Hill*, 658 F.2d at 1285; *accord In re*

*Stanley Plating Co.*, 637 F. Supp. 71, 72 (D. Conn. 1986) (*ex parte* warrant under

Resource Conservation and Recovery Act); *In re Order Pursuant to Section*

*3013(d) RCRA, 42 U.S.C. § 6934(d)*, 550 F. Supp. 1361, 1364 (W.D. Wash. 1982)

(same).  One court has even recognized that "ex parte proceedings are the normal

means by which warrants are obtained in both criminal and administrative

actions."  *National-Standard Co. v. Adamkus*, 881 F.2d 352, 363 (7th Cir. 1989).

In this case, issuance of an *ex parte* warrant is both necessary and justified.

EPA has made reasonable efforts to obtain permission to enter the Site by

attempting to secure consent to entry from the individuals and/or entities that have

control and/or ownership of the Property.  EPA's efforts included contacting each

entity and/or individual as changes were made to the ownership of Whitehall.  *See*

*supra* Section I.D; *see also* Hoppe Decl. ¶¶ 21 - 30.  At this time, an *ex parte*

warrant appears to be the only way in which EPA can obtain proper authorization

to access the Property and ensure remediation of the Site for the protection of

human health and the environment.

## **CONCLUSION**

For the reasons stated above, the United States respectfully requests that this Court issue the proposed *ex parte* administrative warrant authorizing EPA and its representatives to enter the Property for the purposes identified in the warrant.

Dated: October 11, 2024        Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources
  Division
United States Department of Justice

*/s/Roberta R. James*
ROBERTA R. JAMES
Bar Roll #705797
Attorney Advisor
Environment and Natural Resources
  Division
Law & Policy Section
United States Department of Justice
P.O. Box 7415 – Ben Franklin Station
Washington, DC  20044-7415
Telephone: (202) 532-5616
Roberta.James@usdoj.gov

JOHN D. HOGGAN, JR.
Assistant United States Attorney
United States Attorney's Office
Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, New York 12207
Tel: (518) 431-0247
John.Hoggan@usdoj.gov

23