UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF: )<br>)<br>FORMER CP RAIL MAINTENANCE YARD )<br>SUPERFUND SITE, )<br>WHITEHALL, NEW YORK )<br>) | No. _____ |

**EXHIBIT A**

<u>DECLARATION OF SHAWNA K. HOPPE</u>

I, SHAWNA K. HOPPE, pursuant to 28 U.S.C. § 1746, hereby declare and state under penalty of perjury as follows:

1. I am currently, and at all times relevant to this Declaration, employed as a Response Section Supervisor in the Superfund and Emergency Management Division ("SEMD") of the United States Environmental Protection Agency ("EPA"), Region 2 office, located at 2890 Woodbridge Avenue, Edison, New Jersey 08837. As the Response Section Supervisor, I oversee the On-Scene Coordinators ("OSCs") who investigate and respond to reports of threats to human health and the environment that may fall under EPA's authority pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601-9675.

2. I submit this Declaration in support of the United States' *Ex Parte* Application for an Administrative Warrant for Access, pursuant to Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). to conduct removal activities at the Former CP Rail Maintenance Yard Superfund Site ("Site") located in the Town and Village of Whitehall, Washington County, New York.

1

3. I earned a Bachelor of Science in Environmental Science from Lake Superior State University in 1999.

4. I have been employed by EPA for 17 years since 2007, in my current position as a Response Section Supervisor for 7 years and as an OSC for 10 years. As the Response Section Supervisor, my duties include, but are not limited to, managing the OSCs and assisting them in conducting removal site evaluations; developing and implementing mitigation work plans, the identifying, handling and managing of hazardous substances which facilitate site cleanups, related removal activities to address contaminated sites, as well as conducting enforcement activities including, but not limited to, potentially responsible party searches.

5. Prior to EPA, I worked for seven years as an environmental contractor for both Weston Solutions and Lockheed Martin. My work there included project management of CERCLA site cleanups, as well as, responding to emergency releases of hazardous substances as an EPA contractor.

6. I have extensive experience in responding to, managing, and overseeing environmental response actions which includes site assessments and investigations, developing and implementing mitigation work plans, and the identification and handling and managing of hazardous substances.

7. I make this Declaration based upon my personal knowledge of the Site, as the person who supervises the current and former OSCs regarding the Site, my prior knowledge and training as an OSC, my review of EPA records, and the Village of Whitehall property records. The current OSC assigned to the Site is Mark Gallo. The former OSC assigned to the Site, from July 2022 until her retirement in June 2024, was Margaret Chong.

8. The Site is located at 215 Broadway (a/k/a US Route 4), in the Village of Whitehall ("Village"), New York, in a semirural area on the edge of a suburban community and includes one parcel of real estate totaling approximately 28 acres in size, which is identified in the Washington County tax records as parcel number Section 60.9, Block 2, Lot 8.6 (hereinafter, "Property"), as shown on the map, attached hereto as Exhibit 1.

9. The current owner of the Property is LFP of Whitehall, LLC ("LFP"), which is owned by the Fitzpatrick Family Irrevocable Trust. LFP, which was then owned by Lila Foshay ("Foshay"), purchased the Property on February 28, 2008, from DH Estates, Inc. Upon information and belief, LFP's principal place of business is at the Property at 215 Broadway, Whitehall, New York 12887. According to the New York Secretary of State, the address to mail any process served against LFP is Lila Foshay, 88 Forest Drive, Poughquag, New York 12570.

10. The Property, which encompasses approximately 28 acres and includes three main buildings, other structures, and a rail spur, was the location of a former railroad locomotive repair facility and, subsequently other commercial operations. The three Site buildings, which are in disrepair, are clustered adjacent to each other, the closest of which is approximately 135 feet from US Route 4. Building 1 was purportedly used as an office, building 2 was purportedly a former supply building for the locomotive repair shop, and the largest building, building 3, was purportedly the former, locomotive repair shop. All three buildings are located within 700 feet of the Champlain Canal, which is an intrastate commercial and recreational waterway. The Site is not fenced at any property boundary and parts of the Site are densely overgrown with vegetation. There are approximately 900 people residing within ½ mile of the Site and the Whitehall Junior-Senior High School and the Whitehall Elementary School are located approximately two miles from the Site.

11. On April 30, 2018, EPA received a request from the Village of Whitehall, NY to evaluate the Site for a response action under CERCLA. On May 23, 2018, EPA, the New York State Department of Environmental Conservation ("NYSDEC"), and town officials conducted an initial visit to observe the condition of the Site.

12. On May 30, 2018, an authorized representative of Respondent signed a "Consent for Access to Property" form that allowed EPA to sample material from the insulation on piping and on the floors of the buildings on the Property. Analysis of those samples indicated the presence of 66-100% asbestos, a CERCLA hazardous substance, in both the insulation and on floors. At that time, EPA's OSC for the Site informed Respondent of the results and informally discussed addressing the asbestos. Shortly thereafter, Respondent submitted financial information to EPA that indicated that it did not have the financial wherewithal to undertake an asbestos removal action at the Site at that time. Nonetheless, on September 17-18, 2018, the Respondent's representative secured the openings to buildings 2 and 3 by installing fencing and interlocking concrete blocks across the openings as well as boarding up windows.

13. EPA's OSC returned to the Site on June 1, 2021, to conduct a windshield survey of the Site and observe and record its condition. The Property was largely vacant, except for a portion that was reportedly being used by a company for the storage of refrigerated box trailers. In addition, certain sections of two Site buildings were observed as being partially collapsed. Pipe insulation from ceiling pipes was visible in debris on the floor of the buildings and appeared to contain asbestos. As a result, EPA determined that a Removal Site Evaluation ("RSE") was warranted. On June 21, 2021, EPA and its Superfund Technical Assistance and Response Team and its Emergency and Rapid Response Services contractors conducted a reconnaissance of the

Site, among other response actions, to determine sampling locations and to identify potential safety concerns.

14.     At the June 21st reconnaissance, the OSC observed that the three buildings on Site are of brick construction and have fallen into significant disrepair, including unsecured doors, missing roof areas, and collapsed walls, creating structural instability, and allowing unfettered access to the buildings' interiors. The OSC also observed a subterranean area through an opening in the floor in the collapsed portion of building 2, the contents of which were unknown. Additionally, EPA found at the Site (1) a shipping container containing several 55-gallon and 5-gallon containers of lubricants, an acetylene gas cylinder, an oxygen cylinder, and a large partially-filled horizontal tank are located approximately 30 feet south of Building 3 on the Property, (2) a former salt pit is approximately five feet deep and is filled with water, (3) an asphalt pad east of the rail spur is being used to stage refrigerated box trailers, (4) rail tank cars placarded "Flammable" and marked "Liquified Petroleum Gas" have been observed on the rail spur, (5) an irregularly shaped, largely vegetated, mound consisting primarily of soil, railroad ballast and some debris of unknown origin (approximately 30 feet wide and six feet high) begins approximately 65 feet south of the asphalt pad and continues south into the adjoining property, and (6) an approximately 90-foot by 90-foot catch basin lined with degraded plastic sheeting is located immediately north of the asphalt pad.

15.     During the RSE, which was conducted from June to August 2021, a total of 12 bulk and four debris samples of suspected asbestos-containing material were collected from inside the three buildings. The materials that were sampled included pipe insulation and debris suspected of containing pipe insulation. Results indicated all 12 pipe insulation samples contained friable asbestos with concentrations ranging from 8.30% to 23.00% amosite, and

2.80% to 50.00% chrysotile. All samples exceeded EPA's National Emission Standards for Hazardous Air Pollutants ("NESHAP") definition for friable and non-friable asbestos containing material ("ACM"). The NESHAP defines ACM as materials containing more than 1% asbestos. Three of the four debris samples contained up to 17.5% chrysotile and 11.25% amosite, exceeding 1%.

16. On August 23, 2021, the OSC with EPA's contractors returned to the Site and collected a total of eight samples of roofing material from the three buildings to be tested for both asbestos and polychlorinated biphenyls ("PCBs") analysis. Pipe insulation on the ground north of building 2 was also sampled. Additionally, one transite panel from each building was collected and sampled for asbestos. The asbestos results reported for the samples collected from the building 1 roof and transite panel were all either non-detect or less than 1% which is less than EPA's NESHAP definition for friable and no-friable ACM. No asbestos was detected in the roof materials or transite panel from building 2. Friable chrysotile asbestos at 25% was documented in the transite panel sample collected from building 3. The roof material from building 3 was nondetect. The pipe insulation on the ground north of building 2 contained Chrysotile asbestos at 31%. In total, there are approximately 3,680 feet of pipe in the three Site buildings, of which 443 feet are covered with asbestos-contaminated pipe insulation.

17. Two samples of ash were collected from a cleanout area at the base of a smokestack adjacent to building 2. Lead was detected in one of the two samples at an estimated concentration of 880 parts per million ("ppm"), which exceeds the EPA Removal Management Level of 800 ppm.

18. EPA issued the RSE report on February 9, 2022, that documented the Site conditions as well as the results of EPA's Site sampling analysis indicating the presence of

hazardous substances, and that documented an imminent and substantial endangerment to the public health or welfare or the environment due to the actual or threatened release of hazardous substances, consistent with Section 106(a) of CERCLA, 42 U.S.C. § 9606(a). The RSE report can be found here on EPA's website: https://semspub.epa.gov/work/02/628409.pdf

19.  On August 16, 2022, an Action Memorandum was signed by the designated EPA official, approving a removal action at the Site and the expenditure of $1,929,600 to address the threats posed by the Site. The removal action includes, but is not limited to: 1) securing the services of a structural engineer to evaluate the structural integrity of buildings 2 and 3 and make recommendations for how the buildings should be addressed during the removal action; 2) implementing the recommendations of the structural engineer; 3) removing and containerizing the friable ACM from buildings 1, 2, and 3; 4) removing and containerizing the contaminated building debris generated during the removal action; 5) removing and containerizing the top two inches of soil in areas suspected to be contaminated with asbestos fibers; 6) removing and containerizing the contaminated ash from the building 2 smokestack and surrounding soil; 7) collecting, securing and disposing of all drums and containers of waste encountered or uncovered during the removal action; 8) disposing of the contents of a horizontal tank and subsequently decommissioning the tank to prevent further accumulation of liquid; 9) investigating the known subterranean area in building 2, identifying any other similar structures once the building debris is cleared, and mitigating any actual or threatened releases of hazardous substances, pollutants, or contaminants in such areas; and 10) disposing of all hazardous substances and containerized debris at an EPA-approved disposal facility in accordance with the Off-Site Rule, 40 CFR § 300.440. EPA estimates that the duration of the required entry and access to conduct the removal action will be approximately ten months, contingent upon available funding, disposal

requirements, and weather conditions. The Action Memorandum can be found here on EPA's website: https://semspub.epa.gov/work/02/645287.pdf

20. As stated above, Respondent purchased the Property on February 28, 2008, a copy of the deed is attached hereto as Exhibit 2. Foshay was the owner of Respondent. On March 25, 2022, Foshay, after marrying and changing her last name to Rinaldi, sold, assigned, and transferred all of her ownership interest in Respondent to Aden Brook Holdings, LLC ("Aden"), as shown in the document attached hereto as Exhibit 3. That same day, Aden, through Netktarios "Nick" Fitzpatrick ("Fitzpatrick") as the representative of Aden, assigned and transferred its ownership in Respondent to the Fitzpatrick Family Trust ("Trust"), and the Trust, simultaneously assigned Fitzpatrick as the Manager of Respondent and gave him the power to, among other things, enter into any agreement on behalf of Respondent. Copies of the documents showing those transfers are attached hereto as Exhibits 4 and 5. Respondent continues to be the current owner of the Property.

21. On June 21, 2023, EPA sent a letter to the new owner of Respondent, in the care of Fitzpatrick and attorneys for Respondent, containing a notice of potential liability under CERCLA Section 107(a), 42 U.S.C. § 9607(a), a Request for Information pursuant to Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), and a request to enter into a settlement agreement which would allow Respondent to conduct the necessary response action at the Site under EPA oversight. Despite receiving an extension, Respondent never submitted a response to the Request for Information. A copy of the EPA letter is attached hereto as Exhibit 6.

22. In August 2023, EPA attempted to work with Respondent's attorneys to arrange for a Site visit with the EPA OSC at that time, Margaret Chong, and Fitzpatrick, on behalf of

8

Respondent, for the purpose of discussing Respondent's implementation of the response action called for in the Action Memorandum. Respondent failed or refused to agree to the Site visit.

23. From June to September 2023, EPA engaged in negotiations with Respondent regarding its consensual performance of the response action. After Respondent - 1) missed several deadlines during settlement negotiations, including, but not limited to, the date to reach a settlement in principle with EPA and the due date for its response to the CERCLA Section 104(e) Request for Information; 2) cancelled meetings with EPA after the inability of the attorneys to consult with their client; and 3) refused to agree to another request for a Site visit by the OSC - EPA notified Respondent that EPA did not have reason to believe that Respondent could properly and promptly conduct the response action in a manner that was satisfactory to EPA. A copy of EPA's email, which was sent on September 1, 2023, is attached hereto as Exhibit 7.

24. On October 5, 2023, EPA's OSC at that time contacted Fitzpatrick by telephone to notify him that EPA was proceeding with implementing the response action called for in the Action Memorandum and EPA planned to visit the Site that month. Fitzpatrick told the OSC that he was "no longer involved with the Site," had "nothing to do with it," and said that EPA should speak to the attorneys, who were still representing Respondent.

25. Based on Fitzpatrick's comments, on October 11, 2023, EPA's Assistant Regional Counsel, Elizabeth Leilani Davis, called one of two attorneys representing Respondent and left a message with her assistant regarding the upcoming Site visit. On October 12, 2023. Ms. Davis followed up her October 11th call with an email that stated the OSC planned to visit the Site the week of October 23, 2023. The email message also stated that, given Fitzpatrick's October 5th statement that he was no longer involved with the Site, EPA was contacting Respondent's

9

attorneys to determine who to contact to coordinate the Site visit. Ms. Davis did not receive a response to this email message. A copy of Ms. Davis' email is attached hereto as Exhibit 8.

26. Ms. Davis called again on October 13, 2023, and again left a message with the attorney's assistant, and was told that the call would be returned that afternoon, but no return call was received by EPA. Ms. Davis called the attorney again on October 17, 2023, and left another message with the attorney's assistant. In response, EPA received an email that same day from a different attorney representing Respondent, stating that they had previously informed EPA that Respondent no longer consented to EPA's access to the Site, they were not provided with authority to change Respondent's position, and therefore, EPA did not have Respondent's permission to enter the Property. A copy of the email from Respondent's attorney to EPA is attached hereto as Exhibit 9.

27. On December 14, 2023, EPA mailed a letter to Respondent via UPS overnight mail, and emailed this same letter to Respondent's representative and its attorneys, providing Respondent with a final opportunity to consent to EPA's request for access to the Property to conduct the response action described in the Action Memorandum. A copy of the EPA letter is attached hereto as Exhibit 10. Respondent was given until January 3, 2024, to return a signed Consent for Access to Property form that EPA had enclosed. EPA did not receive a response to its letter. To ensure that the December 14th letter was received by Respondent, on January 23, 2024, EPA sent via overnight mail a copy of that letter to the Site and via both overnight and certified mail a copy of that letter to Fitzpatrick at his post office box and residence. EPA also sent the December 14th letter to the offices of Respondent's attorneys. In the January 23rd transmission, Respondent was given until January 31, 2024, to respond to EPA's request for access by signing the Consent for Access form included in the December 14th letter. EPA

received confirmation that the letter was delivered and received by all parties. Respondent has never responded to EPA's December 14th letter. Copies of the two EPA January 23rd letters are attached hereto as Exhibits 11 and 12.

28. On February 29, 2024, EPA issued Administrative Order Directing Compliance with Request for Access, Index No. CERCLA-02-2024-2002 ("Order"), pursuant to Section 104(e)(5)(a) of CERCLA, 42 U.S.C. § 9604(e)(5)(a), to Respondent ordering Respondent to provide EPA and its representatives with unrestricted access at all reasonable times to the Property for the purpose of conducting the response activities set forth in the Order. The access was to be granted continuously from the effective date of the Order until such time as EPA informs Respondent in writing that access is no longer needed in connection with EPA's response. The Order was mailed and emailed to Respondent, Fitzpatrick, and counsel for Respondent the same day. Paragraph 47 of the Order instructs Respondent to notify EPA whether it intends to fully and unconditionally comply with the Order by completing the access form that was attached to the Order and returning it to Ms. Davis, EPA's Site attorney. The Order further states that Respondent's failure to so notify EPA by the time the Order becomes effective shall be construed as a denial of EPA's request for access, and it will, as of the effective date, be treated as a violation of the Order. EPA never received the signed access form from Respondent before the Order became effective on March 21, 2024. A copy of the Order is attached hereto as Exhibit 13.

29. On July 22, 2024, the current OSC for the Site, Mark Gallo, contacted Fitzpatrick in a final attempt to obtain LFP's consent for access without seeking a warrant. During that conversation, Fitzpatrick informed the OSC that he no longer represents LFP, and advised the OSC to contact the same attorneys referred to above. As of the date of this declaration, neither

LFP nor any representative of LFP has granted consent for EPA to access the Property to conduct the necessary response actions referred to in Paragraph 19, above.

30. Pursuant to §§ 104(e)(1), (3), and (4) of CERCLA, 42 U.S.C. §§ 9604(e)(1), (3) and (e)(4), if EPA has a reasonable basis to believe there may be a release or threat of release of a hazardous substance, pollutant, or contaminant, EPA is authorized to enter, inspect, and take samples at a site for the purposes of determining the need for a response, choosing or taking a response, or otherwise enforcing the provisions of CERCLA.

31. EPA has a reasonable basis to believe that "there may be a release or threat of release of a hazardous substance or pollutant or contaminant" from the Site within the meaning of CERCLA Section 104(e)(1), 42 U.S.C. § 9604(e)(1). During the RSE, asbestos was observed in deteriorating friable condition on pipes, building floors and on the ground outside the buildings. Much of the asbestos is damaged and degrading due to age and exposure to the elements. The results of sampling conducted by EPA during the RSE confirm the presence of asbestos at the Site.

32. The conditions at the Site pose a risk to human health and the environment. The exposed previously identified asbestos, some in a friable state, along with the lead in the ash pile, could be released to the environment. Asbestos and lead are designated as hazardous substances pursuant to Section 101(14) of CERCLA and Table 302.4 of the National Contingency Plan (NCP). 42 U.S.C. § 9601(14) and 40 C.F.R. § 302.4. The presence of the friable asbestos and lead at the Property, which continues to be exposed to the elements, constitutes a release or threat of release of a hazardous substance as defined in Section 101(22) of CERCLA. 42 U.S.C. § 9601(22).

33. Conditions at the Site meet the requirements of Section 300.415(b) of the NCP

for the undertaking of a CERCLA removal action at the Property, due to: 1) actual exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants; 2) weather conditions exist that may cause hazardous substances, or pollutants, or contaminants to migrate or be released; and 3) the unavailability of other appropriate federal or State response mechanisms to respond to the release. Due to the existence of friable asbestos and lead at the Property, it is appropriate for EPA to take a response action to abate, prevent, minimize, stabilize, mitigate, or eliminate the release or threat of release of hazardous substances.

34.     Exposure to asbestos can cause a wide variety of adverse human health effects. Breathing lower levels of asbestos can cause changes in the pleural membrane of the lungs through the introduction of blebs (small blisters) or plaques. Exposure to higher concentrations of asbestos can lead to asbestosis or mesothelioma. Lead exposure may also cause serious adverse health effects, particularly in young children. Young children and fetuses are most at risk for harm due to lead exposure.

35.     Entry to the Property by the agents, contractors, or other representative of the United States is needed for the purposes of, taking a response action, or otherwise enforcing the provisions of CERCLA, as provided in Section 104(e)(1) of CERCLA. 42 U.S.C. §9604(e)(1).

36.     The nature and duration of the access is only minimally intrusive given that the Site is currently unoccupied and much of the material that EPA expects to address is readily accessible. EPA requires access to the Site in order to conduct specific removal activities including:

>    a) an assessment by a structural engineer to evaluate and report on the structural integrity of Buildings 2 and 3;

b) the removal and off-Site disposal of asbestos and lead;

c) collection of samples from containers, soil, sediment, water, air, and building components as well as pertinent analyses; and

d) establishment of Site security to restrict unauthorized access including maintenance and/or repair of temporary fencing, and the possible construction of permanent fencing.

37. Due to uncertainties in weather, federal contracting processes, and unknown conditions at the Site, EPA will require at least nine months to conduct the response action to address the hazards posed by the Site and the presence of any CERCLA hazardous substances.

38. EPA's performance of a removal action at the Site cannot be implemented without full lawful and unrestricted entry and access to the Property.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:   Edison, New Jersey

September 9/1, 2024

Hoppe, Shawna
Digitally signed by Hoppe, Shawna
Date: 2024.09.13 13:14:05 -04'00'

SHAWNA K. HOPPE

Response Section Supervisor

U.S. Environmental Protection Agency, Region 2